**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

THE ESTATE OF EVAN KINLOCK,
by and through its personal representative Donna Gauthier, and
L.K., a minor child, by and through next friend Donna Gauthier,

      Plaintiffs,

v.

ACTION STAFFING SOLUTIONS INC.,
HELENE CHRISTNER,
MICHAEL ALLEN,
SUSAN STRONG,
CHARLENE LARSON,
TRISHA KAUTZ,
KELSEY DILLINGER,
CLAUDIA FLINT,
CARLINA ANNIS,
HALEY WERNER,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff the Estate of Evan Kinlock, by and through its personal representative Donna Gauthier, and Plaintiff L.K., individually and through next friend Donna Gauthier, through counsel of the law firm MAXTED LAW LLC, submit the following Complaint and Jury Demand:

## I. INTRODUCTION

      1.    Evan Kinlock died a horrific, lonely, painful death as a result of Defendants' deliberate indifference to obvious and known serious risks to his life. A deadly but easily treatable infection and ensuing complications tragically and needlessly caused his death.

Defendants are prison medical providers at Sterling Correctional Facility (SCF) who assessed Mr. Kinlock and were responsible for his care. They failed to treat Mr. Kinlock as his condition worsened to the point of a life-threatening fever, infection, and sepsis, failed to perform their gatekeeping role by refusing to hospitalize Mr. Kinlock, and instead aggravated the danger to Mr. Kinlock by locking him in isolation—conditions no different than punitive solitary confinement. Defendants violated Mr. Kinlock's constitutional right to medical care and to be free from cruel and unusual punishment and are liable for his suffering and death.

2.      Just 30 years old when he died, Mr. Kinlock was nearly done with a short prison term totaling less than a year for a minor, non-violent offense. He was eligible for parole and a vacant parole bed in the community had just become available to him, making his release from prison imminent. During his incarceration, he'd hoped to work on the egg farm, a prison job that would allow him to save a bit of money to live on when released. Instead, this short prison term became a death sentence due to Defendants' actions.

3.      In January of 2020, Mr. Kinlock began to manifest signs of illness. He was initially diagnosed with a viral syndrome after brief hospitalization. But as his condition worsened back in the prison, he exhibited classic signs and symptoms of endocarditis or other bacterial infection and sepsis, including a life-threatening fever of 105.3 degrees, delirium and hallucinations, fatigue, nausea, diarrhea, chills, profuse sweating, inability to walk, inability to stand, inability to sit, confusion, impaired speech, and other alarming symptoms.

4.      Defendants, all medical providers, knew Mr. Kinlock's symptoms should set off alarm bells, indicating his life was in danger and emergency hospitalization necessary. Yet over a period of a week, Defendants repeatedly failed to hospitalize Mr. Kinlock or otherwise ensure he

received life-saving medical care. Instead, Defendants aggravated the dangers to Mr. Kinlock by locking him in isolation—in conditions of solitary confinement—as his condition deteriorated. Defendants knew Mr. Kinlock suffered from a history of attempted suicide and multiple untreated mental illnesses including post-traumatic stress disorder (PTSD) and anxiety. They knew that isolation presents a significantly aggravated danger of suicide, self-mutilation, or other self-harm—particularly for someone in Mr. Kinlock's deteriorated state, and with his psychiatric history. They knew isolation causes feelings of hopelessness, severe stress and anxiety, and other dangerous effects. Defendants further knew these deadly risks were magnified given Mr. Kinlock's worsening mental state: due to high fever and illness he was delirious, hallucinating, confused, agitated, and obviously a risk to himself.

5.      By January 18, Defendants had callously rejected Mr. Kinlock's repeated cries for help, refusing to send him to the hospital. He by that time had suffered over a week of pain and anguish, and multiple days in isolation. Even though there was light at the end of the tunnel and he was cleared for release on parole, Mr. Kinlock's suffering became intolerable, and his mental state delusional. He tied a headphone wire around his neck and used it to attempt a ligature strangulation. Though unresponsive when found, he was resuscitated and sent to Denver Health for emergency care. He was later removed from life support and pronounced dead on January 25, 2020.

6.      Defendants are liable for Mr. Kinlock's suffering and death for two reasons. First, they exhibited deliberate indifference (and for the wrongful death Defendants, negligence) by failing to treat Mr. Kinlock for the deadly, treatable infection that led to sepsis and ultimately caused his death. Plaintiff alleges that endocarditis and sepsis, among other complications,

caused Mr. Kinlock's death as a result of Defendants' deliberate indifference. Second and alternatively, even if attempted ligature strangulation contributed to his death, Defendants are further liable for their deliberate indifference (and for the wrongful death Defendants, their negligence) to the serious risk of self-harm and suicide present, and for exacerbating this known danger in multiple ways including by confining Mr. Kinlock in harsh, isolating conditions they knew would amount to torture. Defendants knew their action and inaction placed Mr. Kinlock at serious risk of self-harm and suicide and are liable for his death on this alternative basis as well.

## II. JURISDICTION AND VENUE

7.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988, as well as Colorado state law and the Colorado Wrongful Death Act.

8.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

9.   Supplemental jurisdiction over state claims is conferred by 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and meritorious and the state causes of action arise from a common nucleus of operative facts.

10.      Personal jurisdiction over each of the defendants is conferred under Federal Rule of Civil Procedure 4(d)(1).

11.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred.

### III.  PARTIES

12.     Plaintiff the Estate of Evan Kinlock ("Estate") is a party in interest following the death of Evan Kinlock, a United States citizen. The Estate appears through its personal representative, Donna Gauthier, the mother of Mr. Kinlock. At all times relevant, Donna Gauthier was a citizen of the United States. Mr. Kinlock died without a spouse.

13.     Plaintiff L.K. is a minor and the child of Evan Kinlock. Plaintiff L.K was at all times relevant a citizen of the United States and appears by and through next friend Donna Gauthier.

14.     Defendant Action Staffing Solutions Inc. ("Action Staffing") is a company providing medical services within the Colorado Department of Corrections ("CDOC") at SCF, and at all times relevant was the employer of Defendant Susan Strong. The registered agent for Action Staffing is Robin Fischer at 883 N. Cleveland Ave, Loveland, CO, 80573. Defendant Action Staffing may properly be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, decision-making, training, and supervision of staff.

15.     Defendant Helene Christner is a Nurse Practitioner for CDOC responsible for medical care in SCF. At all times relevant to the subject matter of this litigation, Ms. Christner was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Christner was acting under color of state law in her capacity as a medical provider for the CDOC and is sued for her deliberately indifferent actions in this capacity.

16.     Defendant Michael Allen is a Physician Assistant for CDOC responsible for

5

medical care in SCF. At all times relevant to the subject matter of this litigation, Mr. Allen was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Mr. Allen was acting under color of state law in his capacity as a medical provider for the CDOC and is sued for his deliberately indifferent actions in this capacity.

17.     Defendant Susan Strong is a Registered Nurse who at all times relevant was employed by Defendant Action Staffing, and responsible for medical care in SCF. At all times relevant to the subject matter of this litigation, Ms. Strong was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Strong was acting under color of state law in her capacity as a medical provider contractor for the CDOC and is sued for her deliberately indifferent actions in this capacity, as well as her negligence relating to the wrongful death claim.

18.     Defendant Charlene Larson is a Licensed Practical Nurse for CDOC responsible for medical care in SCF. At all times relevant to the subject matter of this litigation, Ms. Larson was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Larson was acting under color of state law in her capacity as a medical provider for the CDOC and is sued for her deliberately indifferent actions in this capacity.

19.     Defendant Trisha Kautz is a Registered Nurse for CDOC responsible for medical care in SCF. At all times relevant to the subject matter of this litigation, Ms. Kautz was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Kautz was acting under color of state law in her capacity as a medical provider for the CDOC and is sued for her deliberately indifferent actions in this capacity.

20.     Defendant Kelsey Dillinger is a Registered Nurse for CDOC responsible for medical care in SCF. At all times relevant to the subject matter of this litigation, Ms. Dillinger was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Dillinger was acting under color of state law in her capacity as a medical provider for the CDOC and is sued for her deliberately indifferent actions in this capacity.

21.     Defendant Claudia Flint is a Registered Nurse for CDOC responsible for medical care in SCF. At all times relevant to the subject matter of this litigation, Ms. Flint was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Flint was acting under color of state law in her capacity as a medical provider for the CDOC and is sued for her deliberately indifferent actions in this capacity.

22.     Defendant Carlina Annis is a Registered Nurse for CDOC responsible for medical care in SCF. At all times relevant to the subject matter of this litigation, Ms. Annis was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Annis was acting under color of state law in her capacity as a medical provider for the CDOC and is sued for her deliberately indifferent actions in this capacity.

23.     Defendant Haley Werner is a Registered Nurse for CDOC responsible for medical care in SCF. At all times relevant to the subject matter of this litigation, Werner was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Werner was acting under color of state law in her capacity as a medical provider for the CDOC and is sued for her deliberately indifferent actions in this capacity.

7

## IV.  STATEMENT OF FACTS

### Evan Kinlock Died Just Before Regaining Freedom

24.     Evan Kinlock was only 30 years old at the time of his death in January of 2020.

Mr. Kinlock was serving a one-year sentence in the Colorado Department of Corrections  for a

relatively minor, non-violent offense. He was admitted to Sterling Correctional Facility on July

30, 2019, and after sentencing reductions his mandatory release date was March 24, 2020. Before

becoming sick, he'd sought to work in the prison egg farm to earn money to support himself

upon his release. He was already eligible for parole before his death and had been approved for a

Condition of Parole (COP) bed in Weld County. This meant Mr. Kinlock was within just weeks

or less of being released from prison when Defendants violated his constitutional rights and

caused his tragic death. Mr. Kinlock was the father of Plaintiff L.K., and the photo below left

shows Mr. Kinlock and his son in a happier time, and a group photo of Mr. Kinlock, L.K., Mr.

Kinlock's sister, and Donna Gauthier is on the right:



### Defendants Knew Evan Kinlock Had Medical Vulnerabilities, a History of Suicide Attempts, and Mental Illness

25.     Defendants knew from evaluating him and from his medical records that Mr.

Kinlock suffered from multiple conditions which made him vulnerable to endocarditis as well as self-harm. On September 30, 2019, Defendant Christner performed a medical evaluation of Mr. Kinlock. Defendant Christner documented Mr. Kinlock's history of kidney issues, Methicillin-resistant Staphylococcus aureus (MRSA), and intravenous (IV) drug use. Defendant Christner noted these conditions in Mr. Kinlock's medical records, which all the other Defendants had access to and reviewed when later assessing him. Defendants knew particularly that Mr. Kinlock's history of IV drug use was a serious risk factor for endocarditis, a bacterial infection attacking the heart. IV drug use is a well-known risk factor for endocarditis because needle injection can introduce bacteria into the bloodstream which then enter and infect the heart. Though deadly if untreated, endocarditis is commonly-known to be easily treatable through IV antibiotics.

26.     Defendants also knew that upon Mr. Kinlock's entry to SCF, he had an abscess on his lower leg, an open wound which he reported had gotten bigger recently. Records document erythema, or irritation, around the wound, and serious drainage from the wound on his sock and around the wound, as well as some edema or swelling, all indicating potential infection. Mr. Kinlock reported he'd taken the antibiotic doxycycline in the past for a similar abscess, which successfully treated the condition. Though treated for this condition in August of 2019, Defendants knew this abscess continued to pose a known risk factor for reinfection, including the endocarditis which eventually would kill Mr. Kinlock.

27.     Records show Defendants knew Mr. Kinlock suffered a hearing impairment arising from a history of cholesteatoma, an ear condition which can cause hearing loss. He was 100% deaf in his left ear and about 50% deaf in his right ear. The impairment in his right ear

necessitated hearing aids. Defendant Christner documented that Mr. Kinlock failed a right-side hearing screening. Mr. Kinlock repeatedly requested hearing aids from Defendant Christner and other staff. He informed Defendants Christner that he had already been approved for hearing aids when he entered CDOC through the Denver Receiving and Diagnostic Center (DRDC). Mr. Kinlock stated he had difficulty communicating with staff. Despite this, Defendants failed to provide Mr. Kinlock hearing aids, evincing deliberate indifference and callous disregard for Mr. Kinlock's disability, health and well-being.

28.      Defendants also knew that Mr. Kinlock suffered from untreated mental health issues and prior suicide attempt, making him highly vulnerable to future attempts. As of September 2019, CDOC medical records show Mr. Kinlock had a known history of suicide attempts. Records document a history of mental health conditions including PTSD and anxiety, intrusive nightmares and other symptoms, and that he had been prescribed psychiatric medication in the past. However, Mr. Kinlock was not taking psychiatric medication at the time of his illness, so these conditions were untreated, placing him at heightened risk for self-harm or suicide should his condition deteriorate. Defendants who assessed Mr. Kinlock reviewed the medical chart and had knowledge of his medical and mental health history.

### Mr. Kinlock's Initial Period of Illness and Hospitalization

29.      In January of 2020, Mr. Kinlock began to show symptoms of illness. On January 7, 2020, Mr. Kinlock sought medical attention and was seen by Defendant Allen. Defendant Allen documented Mr. Kinlock was experiencing nausea, abdominal pain, light headedness, shortness of breath, and syncope, or fainting. Defendant Allen knew from his training and experience that Mr. Kinlock's symptoms were consistent with possible infection. Defendant

Allen ordered blood tests which showed that Mr. Kinlock's monocyte count was elevated. Monocytes are a type of white blood cell which help the body fight infection. Defendant Allen knew this indicated potential infection.

30.     At about 12:56 a.m. on January 9, 2020, a prison guard found Mr. Kinlock unconscious and unresponsive in a prison hallway. Mr. Kinlock was unresponsive when the guard further approached him. The guard called emergency first responders, and Mr. Kinlock was taken to medical within the prison.

31.     Medical staff determined Mr. Kinlock required emergency medical care. However, they failed to order he receive emergency hospitalization for over 10 hours. It was not until approximately 11:40 am later that day that medical staff requested that the prison transport Mr. Kinlock to a hospital. Mr. Kinlock was transported by ambulance to Sterling Regional Medical Center ("SRMC"). This 10-hour delay by medical staff constituted deliberate indifference to Mr. Kinlock's health and well-being.

32.     In the emergency department on January 9 at SRMC, Mr. Kinlock reported that for at least four days had had been suffering from a fever, chills, nausea, syncope, cough, runny nose, that he had lightheaded spells for over a week, that he was not able to eat, that he had some difficulty urinating, and other symptoms. It was clear that Mr. Kinlock had also been reporting these symptoms to prison medical staff including Defendants, demonstrating deliberate indifference and callous disregard to Mr. Kinlock's known medical needs.

33.     At SRMC on January 9, Mr. Kinlock received blood testing which showed elevated monocytes, a marker for infection. The results also showed elevated neutrophils, another type of white blood cell which fights infection and is also a marker someone has an

11

infection. SRMC labs also indicated mildly low sodium and potassium levels. Providers at the hospital diagnosed low potassium and sodium and prescribed fluids and potassium. However, Mr. Kinlock's condition would soon continue to worsen even as potassium and sodium levels improved, ruling that out as the cause of his illness.

34.     SRMC stated in discharge paperwork on January 9 that Mr. Kinlock should be hospitalized if symptoms persist or worsen. These and other SRMC medical records were provided to SCF for review by medical staff including Defendants. On January 10, Defendant Allen ordered that Mr. Kinlock should return to the emergency department at SRMC. However, the hospital quickly discharged Mr. Kinlock, assuming he had a viral syndrome but notably without testing him for bacterial infection. He arrived at the hospital around 5:00 p.m. and appears to have been discharged in a little over an hour on January 10, the same day. Defendants failed to hospitalize him in ensuing days as his condition worsened towards death.

**Cries For Help Ignored**

35.     From January 11 until January 18, Defendants failed to hospitalize or otherwise provide constitutionally-adequate care for Mr. Kinlock as his illness grew worse and he repeatedly begged for help. They failed their gatekeeping responsibility by refusing to hospitalize Mr. Kinlock. On January 13, 2020, Mr. Kinlock became desperate for medical care. Corrections officers reported he "stumbled in the office, shivering aggressively, blue in the lips and having a rough time breathing." Officers called for first responders, who transported Mr. Kinlock on a gurney to medical because he was unable to walk he was so sick.

36.     Defendants Larson and Christner evaluated Mr. Kinlock in the medical unit, documenting worsening symptoms and desperate cries for help from Mr. Kinlock. Mr. Kinlock

12

informed Defendants that he felt worse, was having loose stools, was not eating or drinking, was in pain and fatigued, and that "something is wrong and no one is doing anything." He was in too much pain to stand and so extremely ill he was unable to walk. Despite these alarming symptoms obviously calling for emergency care, Defendants failed to hospitalize Mr. Kinlock or request that a doctor evaluate him, in deliberate indifference and callous disregard to the obvious and serious risk of bacterial infection.

37.     Demonstrating their knowledge of potential infection, Defendants obtained additional blood tests showing new findings indicating potential infection. Blood tests showed toxic granulation typical of a bacterial infection and vacuolated typically found in cases of severe systemic infections and sepsis. On information and belief, Defendants knew from their training and experience that these tests, and Mr. Kinlock's worsening symptoms, indicated bacterial infection necessitating emergency treatment such as antibiotics.

38.     Moreover, Defendants knew that by this point a viral syndrome should be ruled out and bacterial infection was likely. Defendants knew viral syndromes typically wane with time as a patient's immune system overcomes the virus. Indicating he did not have a virus, Mr. Kinlock's condition had worsened over time. Defendant knew tests could easily be ordered for bacterial infection, but they failed to order such tests and failed to hospitalize Mr. Kinlock where further testing and treatment would occur.

39.     Defendants also ignored instructions from providers at SRMC that Mr. Kinlock should be returned to the hospital and receive emergency care if his condition worsens—a protocol also known to Defendants in their training and experience. This further indicates Defendants acted with deliberate indifference to their role as gatekeepers to hospitalization or

13

other emergency care.

**Condition Worsens on January 14, Defendants Fail to Hospitalize Mr. Kinlock**

40.     On January 14, Mr. Kinlock was extremely ill and this was obvious to everyone

who saw him. In the middle of the night on January 14, at around 12:25 a.m., first responders

were again called to Mr. Kinlock. Defendant Flint, in communication with Defendant Allen,

responded. Corrections officers felt Mr. Kinlock needed immediate medical attention, even in the

middle of the night, a remarkable occurrence indicating Mr. Kinlock was obviously gravely ill.

Typically, unless someone is extremely ill or in danger of dying, guards at SCF will delay calling

medical staff until the morning. Therefore, this call for emergency care in the middle of the night

indicated Mr. Kinlock was visibly and extremely ill to the point of obviously necessitating

emergency care. He exhibited many of the same concerning symptoms he'd been displaying as

alleged herein.

41.     For these and the same reasons alleged above regarding Defendants' deliberate

indifference on prior dates, once again Defendants Flint and Allen failed to adequately treat Mr.

Kinlock on this date and showed deliberate indifference to his serious and deteriorating

condition, failing also to hospitalize Mr. Kinlock or perform their gatekeeper role.

42.     It wasn't only prison guards who saw Mr. Kinlock obviously needed emergency

medical care. Later on January 14, Mr. Kinlock had a scheduled appointment with his case

manager Breann Steele. When he arrived at the office, Mr. Kinlock was dehydrated, feeling

weak, dizzy, and having difficulty breathing, which he reported to Ms. Steele. He told Ms. Steele

he had been very sick the last couple of weeks. Alarmed, Ms. Steele called medical and reported

the symptoms, along with Mr. Kinlock. Mr. Kinlock reported his symptoms to medical over the

14

phone and stated he felt unable to walk, information received by Defendants Christner and

Annis. First responders within SCF were called and he was transported to medical within the

prison, once again on a gurney. Before he left, Ms. Steele informed Mr. Kinlock he'd been

accepted for a parole bed in the community, indicating he'd be released from prison very soon.

43.     Defendants Christner and Annis assessed Mr. Kinlock in medical. They learned

Mr. Kinlock was obviously and seriously ill:  he appeared pale, fatigued, and sick; he reiterated

he was having difficulty breathing, difficulty urinating, loose stools, and other symptoms, the

same symptoms he had already reported suffering without treatment. He stated he was dizzy and

too weak even to walk, and he once again cried for help. Mr. Kinlock had diarrhea and

Defendant Christner and an officer had to assist Mr. Kinlock to use the restroom he was so weak.

44.     In deliberate indifference and callous disregard to obvious and known serious

risks to his health and life, Defendants failed to hospitalize Mr. Kinlock on this date, failed to

seek a doctor's evaluation of him, and failed to do anything to appropriately treat him or perform

their gatekeeper role. Instead, Mr. Kinlock was relegated to medical isolation in conditions

amounting to torture.

### Defendants Impose Isolation; Mr. Kinlock In Delirium and Mental Decline

45.     Shockingly, rather than hospitalize Mr. Kinlock, Defendant Christner ordered Mr.

Kinlock to be locked in medical isolation in conditions of solitary confinement. Isolation cells

are typically reserved for incarcerated people in need of medical treatment but who have high

security needs, or for people in punitive segregation for disciplinary violations or violence in the

institution. Mr. Kinlock did not require high security and had done nothing wrong—in fact, he

was nearly done with a short, low-level prison term and about to be released to the community.

Moreover, he had been extremely ill, fatigued, and posed no threat to anyone. All he wanted was to go to the hospital and receive life-saving care. Despite this, Defendants locked him in severe conditions of isolation amounting to torture. In isolation, Mr. Kinlock was locked in his cell for nearly 24 hours a day. He had no cellmate or social contact. Medical staff checked on him as little as once a day at his cell door through the window or food tray slot, failing to assess him in a hospital room or bed. Rather than treat him like a patient, Defendants treated Mr. Kinlock with cruelty and callous disregard for his suffering.

46.     Such conditions of solitary confinement constitute torture. Even for otherwise healthy people, solitary confinement is known to cause serious trauma and related health risks, including severe anxiety and stress, hopelessness, irritability and anger, panic attacks, exacerbated symptoms of pre-existing mental health conditions, thoughts of self-harm, suicide, self-mutilation, psychosis, hallucinations, and other symptoms. Even a day of isolation can cause such dangerous symptoms and self-harm. For someone like Mr. Kinlock with untreated psychiatric conditions of PTSD and anxiety, with a history of suicide attempts, who is delirious and hallucinating from severe fever, who is in distress from a serious and ongoing illness—such conditions of isolation can amount to a death sentence. Solitary confinement also causes adverse physical health impacts and can exacerbate pre-existing conditions and illness. On information and belief, Defendants knew from their training and experience, from Mr. Kinlock's records, and from their observations of his suffering and symptoms, that housing Mr. Kinlock in these isolating conditions would exacerbate the already-serious and obvious dangers to his life and well-being.

47.     On January 15, Defendant Strong assessed Mr. Kinlock at the window of his cell

16

in isolation. She did not take Mr. Kinlock to a medical room like a patient. Mr. Kinlock immediately asked to be released from isolation, indicating the isolation was harming him. Many of his symptoms, including diarrhea, were persisting. Defendant Strong failed to take any vitals or conduct a physical examination of Mr. Kinlock. Her failure to treat Mr. Kinlock or performer her gatekeeper role by hospitalizing him constituted deliberate indifference to the known, obvious risks to Mr. Kinlock's well-being.

48.     The next day, January 16, Defendant Strong again saw Mr. Kinlock at his cell under similar conditions at the door, failing to treat him like a patient and instead treating him like he was in punitive segregation. His physical and mental condition had continued to deteriorate. Defendant Strong documented "His gait was unsteady and he appeared to have some delirium." Mr. Kinlock was unable to walk to the door independently. Ominously, Mr. Kinlock's vitals were taken and his fever was 105.3 degrees, which Defendant Strong knew to be an extremely high, life-threatening fever requiring immediate hospitalization. His was also tachycardic with a very high heart rate at 140 beats per minute.

49.     Defendant Strong knew Mr. Kinlock was obviously very sick, that his condition had worsened, and that he was in need of urgent care. He was delirious and had an altered mental state, a dangerous sign of sepsis and deadly infection. Illustrating this, Defendant Strong observed that Mr. Kinlock denied being ill to her despite his obvious and severe sickness. She concluded his denial of being sick was a delusion or hallucination brought on by the illness and severe fever. She noticed his mental state was so unsound and altered he was unable to comprehend that his temperature was dangerously high.

50.     Moreover, Defendant Strong knew Mr. Kinlock was frantic to escape the severe

conditions of isolation. He again repeatedly begged to be released from isolation, confirming it

was harming him and placing him at risk. He became so desperate to get out of isolation and

receive medical treatment that he grabbed the food tray slot in the door to his isolation cell and

would not let go. He refused a corrections officer's directive that he let go of the slot—risking a

disciplinary sanction he was so desperate to obtain care and escape the conditions of torture.

Weakened, his cries for help ignored, he finally let go and was once again shut in isolation

amounting to torture.

51.     Defendant Allen was notified of all of the above information and Defendant

Strong's assessment, as were all Defendants who later assessed him given it was entered into the

chart. Despite Mr. Kinlock's life-threatening fever, his delirium and fragile mental state,

Defendants Strong and Allen failed to provide constitutionally-adequate care, failed to

hospitalize him, and failed to perform their gatekeeper role in deliberate indifference and callous

disregard to his known and obvious medical needs.

52.     Defendants knew that Mr. Kinlock's tachycardia (elevated heart rate),

cardiopulmonary distress, dangerously-high fever, and altered mental state, were all classic signs

of endocarditis or other infection, as well as sepsis, requiring emergency hospitalization and

treatment.

53.     They further knew that Mr. Kinlock's history of IV drug use and an open leg

abscess earlier in his prison term were both risk factors for endocarditis or other bacterial

infection, which may have taken months to manifest. Despite this, they failed to test for

infection, failed to send him for emergency care, and failed to take any action that would result

in constitutionally-adequate medical care. Defendant Allen merely prescribed Tylenol, an over

the counter medication for ordinary fever and pain relief they knew would fail to treat underlying endocarditis or sepsis. Defendants Allen and Strong knew Tylenol would amount to superficial treatment and would not treat bacterial infection, was inadequate to treat the cause of Mr. Kinlock's life-threatening 105.3 degree fever, and would not alleviate the danger posed to Mr. Kinlock's life and well-being.

54.     Further, Defendants Allen and Strong knew by this point that the January 10 diagnosis of viral syndrome was outdated and could not be relied on given Mr. Kinlock's severely deteriorated condition and 105.3 degree fever. Whereas a viral syndrome typically decreases in severity as the body fights it off, an untreated bacterial infection worsens in severity as the bacteria attack tissue and the body's immune response increases. Here, Mr. Kinlock's condition had obviously and visibly worsened to the point of a deadly fever, which Defendants knew indicated bacterial infection. At a minimum, Defendants knew emergency hospitalization and further testing were necessary to further diagnose and treat Mr. Kinlock given the deterioration and worsening of his condition. Despite this, they did essentially nothing and left Mr. Kinlock in isolation, manifesting deliberate indifference and callous disregard for Mr. Kinlock's life and health.

55.     Defendants knew from the medical chart that Mr. Kinlock suffered from a history of suicide and had untreated psychiatric illnesses including PTSD and anxiety, exposing him to a higher likelihood of self-harm or suicide. Given his agitation, delirium, and dangerously altered mental state, Defendants knew Mr. Kinlock posed a serious risk of self-harm in the untreated state he was in, particularly in an isolated conditions known to worsen psychiatric symptoms and

cause psychosis, self-harm, suicide, and other harms. Yet, they intentionally confined him in harsh, isolating conditions threatening his life, amounting to deliberate indifference.

56.     Defendant Strong again assessed Mr. Kinlock at his isolation cell on January 17 around 11:30 a.m. She observed he was still extremely ill, noting Mr. Kinlock had difficulty standing and was "holding onto objects as he managed to get to the window" of the cell. Defendant Strong checked his vitals, learning he still had a dangerously high fever of 103.4 degrees and an elevated pulse. Further indicating illness, his oxygen saturation had dropped to 88%, well below normal and cause for emergency medical care, and he was suffering from edema in one leg. As Mr. Kinlock attempted to walk back to his bed after the brief assessment, he was still unstable and holding onto objects in order to move. Defendant Strong informed Defendant Allen of the above information. They once again failed to hospitalize Mr. Kinlock, failed to conduct further testing for bacterial infection, and manifested the same deliberate indifference and callous disregard that had come to characterize their treatment of Mr. Kinlock.

## Defendants Ignored Visible Deterioration The Morning of January 18

57.     The next day, January 18, at about 10:10 am, Mr. Kinlock was so obviously and extremely ill that corrections officers called medical and reported that Mr. Kinlock "didn't look good" and needed care. Corrections staff transported Mr. Kinlock to medical because he could not walk on his own. He was once again placed on a gurney.

58.     Defendants Christner, Dillinger, and Kautz participated in assessing Mr. Kinlock's condition on this date. Mr. Kinlock was weak and delirious. He was not able to move his limbs. Defendants noted this was a "significant change since yesterday," a notable statement given his condition was already terrible. He was slow to respond to verbal stimuli, had

significant diarrhea, he was pale and diaphoretic (sweating profusely), and he needed assistance to sit up.

59.     Defendants observed Mr. Kinlock was experiencing delusions, hallucinations, impaired speech, and was in a dangerously altered mental state, a psychosis induced by the severity of his illness. Mr. Kinlock stated "he feels like he is in a trance." Defendants observed he needed redirection during conversation, indicating confusion. Mr. Kinlock needed help to put his own pants on.

60.     Confirming hallucinations and psychosis, when asked why he was profusely sweating Mr. Kinlock responded that it wasn't sweat, it was spilled water. Defendants observed this was untrue, noting he had "no drink at all," and concluded it indicated delusions brought on by his severe illness.

61.     Desperate for his life, Mr. Kinlock begged Defendants to send him to the hospital. Defendants refused. Mr. Kinlock was dangerously delusional, had been severely febrile, was tachycardic, diaphoretic, and hypertensive—all symptoms of a severe systemic infection. Defendants knew Mr. Kinlock had been sick for over 10 days, and had not seen a hospital physician in 8 days. They knew a SRMC doctor had instructed rehospitalization should his condition worsen or persist, as it obviously had. Callously and deliberately ignoring obvious and overwhelming evidence Mr. Kinlock needed emergency care, Defendants refused to send Mr. Kinlock to the hospital or otherwise ensure he received emergency care for his life-threatening condition.

62.     Defendants also cruelly locked Mr. Kinlock in conditions they knew posed a serious risk of suicide or self-harm. Mr. Kinlock repeatedly begged to be removed from medical

isolation, a traumatizing environment which exacerbated his illness, mental delirium, and

suffering. They refused, knowingly exposing him to serious risks of self-harm or suicide, given

his known history of suicide attempts and untreated mental illness.

**Death Caused by Infection and Sepsis**

63.     On January 18, 2020, at 8:00 pm, Mr. Kinlock was found in cardiac arrest in his

isolation cell. The cord from a pair of earbuds had been tied around his neck in an apparent

suicide attempt. Mr. Kinlock was resuscitated by CPR and transported to Denver Health Medical

Center. Mr. Kinlock was diagnosed at Denver Health with septic shock, septic pulmonary

emboli, endocarditis, empyema, pneumonia, and other conditions. He was taken off life support

on January 25, 2020, and died.

64.     An autopsy concluded the cause of death was "multiple infectious complications:

endocarditis, pneumonia, empyema, sepsis" and "attempted ligature strangulation." However, the

autopsy incorrectly concluded that the endocarditis, sepsis, and other infectious complications

occurred as a result of the attempted ligature strangulation. The medical examiner failed to

appreciate medical and other records confirming Mr. Kinlock was already suffering from

endocarditis, sepsis, and other conditions prior to the attempted ligature strangulation, as

extensively alleged herein. Therefore, Plaintiffs allege the autopsy's conclusion that the manner

of death was suicide is incorrect. Plaintiffs allege that the infection and sepsis preceded the

attempted ligature and caused Mr. Kinlock's death.

65.     Mr. Kinlock's body revealed significant damage caused by untreated bacterial

infection which originated prior to the attempted ligature. Endocarditis, a cause of his death, is a

bacterial infection of the heart. Symptoms of endocarditis include pain in the chest or abdomen,

22

muscle pain, fever, malaise, diarrhea, and fever—all symptoms Mr. Kinlock suffered from prior to the attempted ligature. Mr. Kinlock's heart had a cluster of yellow-brown vegetative growths on the tricuspid valve of his heart and the wall of the atrium. The infection vegetations measured up to 1.5 cm in size. Examination of the heart further revealed acute necrosis, or the death of cells or tissue, and small abscess formation, in multiple heart valves.

66.     Sepsis, another cause of Mr. Kinlock's death, is a deadly condition involving the body's massive inflammation resulting from a serious infection. A pre-existing infection in the body, such as endocarditis, triggers a chain reaction throughout the body, an extreme immune response that can lead to septic shock and death. Prior to January 18, Mr. Kinlock was suffering from symptoms consistent with sepsis, including fever, chills, nausea, diarrhea, fatigue, difficulty urinating, psychosis, altered mental state, respiratory distress, high heart rate, and other symptoms. Defendants knew Mr. Kinlock exhibited symptoms consistent with sepsis for as many as 8 days prior to his attempted ligature strangulation on January 18.

67.     Plaintiffs therefore allege that conditions causing Mr. Kinlock's death, including endocarditis and sepsis, were caused by Defendants' deliberate indifference to his known and obvious medical needs.

**Defendants' Deliberate Indifference Caused Mr. Kinlock's Attempted Self-Harm**

68.     Plaintiffs alternatively allege that had Mr. Kinlock not been suffering from a deadly infection and placed in isolation as a result of Defendants' deliberate indifference, he would never have attempted ligature strangulation just weeks (or less) before his release from prison on parole. Similarly, had Mr. Kinlock not already been dying from infection and sepsis, he may have survived the attempted ligature. Either way, with or without the attempted ligature,

23

it was Defendants' deliberate indifference which caused Mr. Kinlock to suffer from untreated deadly infections which caused his death.

69.     Defendants' deliberate indifference to Mr. Kinlock's infection directly caused his delusional, altered mental state which drove him to attempted ligature strangulation, an obvious, known, and foreseeable risk given the severity of his illness, given Mr. Kinlock's history of suicide attempts and his untreated mental illness, and given their locking Mr. Kinlock in solitary confinement in conditions amounting to torture.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983—Eighth Amendment Violation
### (Against All Individual Defendants)

70.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

71.     42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

72.     Mr. Kinlock was a citizen of the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

73.     At all times relevant, Mr. Kinlock was a prisoner serving a sentence in custody and had clearly established rights under the Eighth Amendment to medical care and well-being, and to be free from deliberate indifference and reckless disregard for his known serious medical

needs as well as from cruel and unusual punishment.

74.     At al times relevant, the Defendants knew of these clearly established constitutional rights of Mr. Kinlock as a prisoner serving a sentence, and knew that their conduct violated clearly established law, and are not entitled to qualified immunity.

75.     Defendants' actions and inaction deprived Plaintiff of his Constitutional rights, and Defendants were deliberately indifferent to known and excessive risks of serious harm to Mr. Kinlock.

76.     Each of the Defendants identified herein subjectively knew about and was deliberately indifferent to the dangers posed, which they intentionally and deliberately disregarded; and, they knew of these excessive risks because they were obvious to them.

77.     All Defendants were acting under color of state law at all times relevant to this action.

78.     Each Defendant is individually liable to the Plaintiff for violation of 42 U.S.C. § 1983.

79.     Each of the Defendants identified herein subjectively knew about and was deliberately indifferent to the dangers posed, which they intentionally and deliberately disregarded; and, they knew of these excessive risks because they were obvious to them.

80.     Each Defendant hereto recklessly and knowingly denied medical treatment for known serious medical issues. Defendants hereto were also deliberately indifferent in delaying and denying Mr. Kinlock proper evaluation, treatment, and transport to a medical facility to obtain higher-level medical care.

81.     Defendants' knowing conduct constituted deliberate indifference and willful and wanton disregard to the excessive, substantial risks of serious harm and death to Plaintiff, depriving Plaintiff of life's necessities and life itself, failing to provide Plaintiff safe or humane conditions of confinement, failing to protect Plaintiff's health, safety, and well-being, in violation of Plaintiff's Fourteenth Amendment due process rights, including the right not to be deprived of his life.

82.     Defendants knowingly, intentionally, willfully, and maliciously disregarded the obvious risks of bodily injury and death to Plaintiff, failed to provide humane conditions of pretrial detention, deprived Plaintiff of life's necessities and life itself, and violated Plaintiff's Eighth Amendment rights, resulting in substantial harm and death to Plaintiff.

83.     The acts or omissions of Defendants were the legal and proximate cause and the moving force behind Plaintiffs injury and damages, and Mr. Kinlock endured grievous pain and suffering and died as a result of Defendants' deliberate indifference.

84.     All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

85.     Plaintiff is entitled to and will seek punitive damages against these Defendants in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

86.     Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983—Eighth Amendment—*Monell* Liability**
**(Against Defendant Action Staffing)**

87.      Plaintiff incorporates all other paragraphs of this Complaint as if fully stated

herein.

88.      Defendant Action Staffing Solutions Inc. is a private corporation that contracted

to provide services within SCF including providing medical care, and was at all times relevant

the employer of Defendant Susan Strong.

89.      Defendant Action Staffing, at all times relevant, was acting as the functional

equivalent of a municipal service in providing medical care for people serving state prison

sentences.[1]

90.      As a result of the allegations contained in this Complaint, Defendant Action

Staffing is liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies,

customs, procedures, decision-making, and training that resulted in the violation of Plaintiff's

Eighth Amendment rights, including his right to medical care, safety, and well-being while in

custody and not subjected to cruel and unusual conditions of confinement.

---

[1] Plaintiffs will also argue that the Tenth Circuit case of *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) should be revisited and overruled and that respondeat superior should apply to private entities in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right.").

91.     Defendant Action Staffing knew that these policies, customs, procedures, decision-making, and training, posed an excessive risk of serious harm to people in custody like Plaintiff, and it was obvious that such serious harm would occur. Nevertheless, Defendant failed to take reasonable steps to alleviate those substantial risks. There is an affirmative causal link between the deliberate indifference of Defendant Strong towards Plaintiff's protected rights and the policies, procedures, customs, decision-making, and training described herein, which were also the moving force behind the Defendant Action Staffing's unconstitutional conduct and the moving force resulting in Plaintiff's injuries and damages, including his death.

92.     The unconstitutional acts and omissions of Defendant Action Staffing was the moving force in the unconstitutional acts of Defendant Strong, and the moving force resulting in the injuries and damages suffered by Plaintiff. Defendant Action Staffing is liable for the non-delegable duties to provide constitutionally-adequate care, and to adequately hire, train, supervise, and monitor its employees.

93.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered injuries and losses entitling it to recover its compensatory and special damages, including for extreme physical pain and suffering before and during his death, loss of constitutional rights, loss of life, all in amounts to be proven at trial.

94.     Plaintiff is entitled to and will seek punitive damages against Defendant Action Staffing, in that its actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

95.     Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, including prejudgment interests and costs as allowable by federal law.

**THIRD CLAIM FOR RELIEF**
**Wrongful Death**
**(Plaintiff L.K. Against Defendants Action Staffing and Susan Strong)**

96.     Plaintiff incorporates all other paragraphs of this Complaint as if fully stated herein.

97.     Plaintiff L.K., a minor child of Mr. Kinlock, is authorized to file suit under the Colorado Wrongful Death Act, and does so through next friend Donna Gauthier.

98.     Defendant Action Staffing is a private corporation that contracted with CDOC to provide services including medical care for incarcerated individuals in CDOC.

99.     Defendant Susan Strong was at all times relevant employed as a nurse by Defendant Action Staffing, and her duties included being responsible for medical care, monitoring the medical condition of incarcerated individuals, and other medical and mental health services.

100.    Defendant Action Staffing is vicariously liable for the negligent acts and omissions by their agents and/or employees, including but not limited to Defendant Strong and other medical or other workers, whether or not they are named defendants.

101.    Defendants Action Staffing and Strong are private persons and entities for purposes of this claim, not public employees, and therefore are not entitled to immunity under the CGIA.

102.    Defendant Strong, a nurse, had duties of care to appropriately evaluate and monitor Mr. Kinlock, to screen him for further medical and mental health needs, to raise medical concerns with superiors and other appropriate staff, and other medical and mental health care duties to ensure incarcerated individuals received constitutionally adequate care.

29

103.     Defendant Action Staffing had a duty to implement reasonable policies, customs, procedures, training, supervision, and decision-making, and to exercise reasonable care, regarding their employees working in the prison, including Defendant Strong.

104.     These duties of care are informed by state law, which under C.R.S. § 16-3-403 mandates that "persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and if required, medical treatment." Humane treatment requires safety and protection from serious harm and death, including death by suicide or infection. Adequate medical treatment requires both medical and mental health care, and further requires providers to serve a gatekeeping role and to hospitalize or seek emergency care in appropriate circumstances. Defendant Strong failed to meet these and other duties of care.

105.     Defendant Strong breached her duty of care when she knowingly, recklessly, and negligently failed to appropriately treat or seek emergency care for Mr. Kinlock, whom she knew to be severely ill and a danger to himself, placing Mr. Kinlock at high risk for death or serious harm.

106.     Defendant Action Staffing breached its duties as articulated herein, and is vicariously liable for the reckless and negligent acts and omissions by their agents and/or employees, including Defendant Strong, and other individuals not named herein. Defendant Action Staffing is also directly liable for its own reckless and negligent failures in training, policies, practices, and supervision.

107.     Defendant Action Staffing knew or should have known that the lack of supervision, training, and experience among their employees and agents was likely to harm individuals in their care and affected by their decisions, including Mr. Kinlock.

108.    In failing to exercise reasonable care to meet the duties described herein, Defendants Action Staffing and Strong recklessly and negligently caused Plaintiff's injuries and damages including Mr. Kinlock's death. The reckless and negligent acts and omissions by these Defendants also were a substantial and significant contributing proximate cause of the death of Mr. Kinlock's and Plaintiffs' damages.

109.    As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff suffered damages, losses, and injuries in an amount to be determined by a jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other damages as allowed under the Colorado Wrongful Death Act.

110.    As a result of Defendants' acts and omissions as described herein, Plaintiff suffered particularly grievous pain, suffering, and other damages as described above.

111.    Plaintiff has suffered and continues to suffer economic and non-economic damages due to Defendants' reckless and negligent conduct toward Mr. Kinlock, including financial losses, non-economic damages for grief and suffering, loss of companionship, impairment in the quality of life, inconvenience, pain and suffering, and extreme emotional distress. Plaintiff is therefore entitled to general and compensatory damages and to special damages.

112.    Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

## VI.  CERTIFICATE OF REVIEW

Undersigned counsel submits this Certificate of Review pursuant to C.R.S. § 13-20-602 and Colorado law declaring that counsel has consulted with a person with extensive expertise in the areas of the alleged negligence and deliberate indifference present in this action, that this professional has reviewed the known facts, including records, documents, and other materials which the professional has found to be relevant, and that this professional has concluded that the filing of the claims in this case do not lack substantial justification.

## VII. PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendants, and award Plaintiff all relief as allowed by law and equity, including, but not limited to the following:

a)   Declaratory and injunctive relief, as appropriate;

b)   Actual economic damages as established at trial;

c)   Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of life and enjoyment of life, and other non-pecuniary losses;

d)   Punitive damages on all federal claims as allowed by law in an amount to be determined at trial against all applicable Defendants;[2]

e)   Issuance of an Order mandating appropriate equitable relief;

f)   Pre-judgment and post-judgment interest at the highest lawful rate;

---

[2] Plaintiff L.K. also anticipates seeking punitive damages for the state law claim upon suitable amendment after completing substantial discovery.

g) Attorney fees and costs; and

h) Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: December 28, 2021.

Respectfully submitted,

*s/ David G. Maxted*

David G. Maxted
Rachel Z. Geiman
MAXTED LAW LLC
1543 Champa Street Suite 400
Denver, CO 80202
dave@maxtedlaw.com
rachel@maxtedlaw.com
720-717-0877

*Attorneys for Plaintiff*

33